**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SARA MARCELL-KUEHNER, ) | |
| ) | |
| Plaintiff, ) | Case: |
| ) | |
| v. ) | |
| ) | |
| RXO MANAGED TRANSPORT, LLC, ) | |
| ) | Jury Trial Demanded |
| Defendant. ) | |
| ) | |

## COMPLAINT

Plaintiff, Sara Marcell-Kuehner ("Plaintiff"), by and through the undersigned counsel, hereby files this Complaint against RXO Managed Transport, LLC ("Defendant"), and in support states as follows:

### NATURE OF PLAINTIFF'S CLAIMS

1. This lawsuit arises under the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq. as amended, ("ADA") seeking redress for Defendant's failure to accommodate Plaintiff's disability, Defendant's disability-based discrimination, Defendant's disability-based harassment, and Defendant's retaliation against Plaintiff for engaging in a protected activity under the ADA.

### JURISDICTION AND VENUE

2. This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 as the ADA, 42 U.S.C. §12101 *et seq*. is a federal statute.

3. Venue of this action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §1391(b) insofar as a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## ADMINISTRATIVE PREREQUISITES

4. All conditions precedent to jurisdiction under the ADA of 1990, 42 U.S.C. §12101, *et seq*. have been satisfied.

5. Plaintiff filed a charge of employment discrimination on the basis of disability and retaliatory discharge with the Equal Employment Opportunity Commission ("EEOC") (attached hereto as Exhibit "A").

6. Plaintiff received a Notice of Right to Sue from the EEOC (attached hereto as Exhibit "B").

7. This Complaint has been filed within ninety (90) days of Plaintiff's receipt of the EEOC's Dismissal and Notice of Right to Sue.

## THE PARTIES

8. Plaintiff, Sara Marcell-Kuehner, is a natural person, over 18-years-of-age, who at all times relevant to the allegations in this Complaint resided in Will County, Illinois.

9. Defendant, RXO Managed Transport, LLC. whose address is 263 Shuman Boulevard Suite 400, Naperville, IL 60563 is a limited liability company that at all times material to the allegations in this Complaint was doing business in and for DuPage County, Illinois.

10. Plaintiff was employed by Defendant as an "employee" within the meaning of the ADA, 42 U.S.C. §12111(4).

11. During the applicable limitations period, Defendant has had at least fifteen employees, has been an "employer" as defined by ADA, and has been engaged in an industry affecting commerce within the meaning of 42 U.S.C. §12111(5)(A).

## BACKGROUND FACTS

12. Plaintiff worked for Defendant as a freight pay specialist from on or about January 22, 2001, until Plaintiff's unlawful termination on or about April 8, 2024.

2

13. In Plaintiff's position, Plaintiff's essential job duties included:

    a. Verifying accuracy of invoices;

    b. Checking contracts for discrepancies such as fuel;

    c. Working with customers to figure out the differences between contract to get things corrected; and

    d. Supporting other departments such as procurement.

14. In or around 2004, Plaintiff was diagnosed with Asthma.

15. As a result of Plaintiff's disability, Plaintiff's major life activities are impacted such as her ability to breathe, ability to withstand fumes, and causes asthma attacks.

16. Plaintiff's symptoms require medication.

17. Regardless of Plaintiff's disability, she was able to perform the essential functions of her job with or without reasonable accommodation.

18. Plaintiff is a "qualified individual" as defined under the ADA.

19. For the past ten (10) years, Plaintiff has had issues with asthma at the office.

20. Specifically, Defendant's office location would have various maintenance done requiring the use of chemicals and other strong scents that would trigger Plaintiff's asthma.

21. For example, Defendant would have carpet installation, stripping and re-sealing flooring, caulking, glues, adhesives, painting, perfumes, cleaning supplies and even individuals who would vape despite it being against company policy.

22. In response to these chemicals and strong scents, Plaintiff would have to use nebulizer treatments or leave the office for urgent care.

23. Plaintiff would repeatedly be told that she would be notified in advance of any maintenance or chemical-related work so that she could arrange to work from home demonstrating that Defendant was aware of Plaintiff's disability and need for accommodation.

24. However, Defendant's assurances were not honored.

25. Defendant's office managers, Dave Mackenben and Robert Niemann, were responsible for providing advance notices of scheduled work but consistently failed to do so.

26. Plaintiff reported their failure to notify the building manager and was told that she would be notified about maintenance, but she continued to not be told.

27. This caused plaintiff to have asthma attacks and get very sick.

28. Plaintiff also went to the maintenance team to ask about being notified but was told that it was up to the owner of the building and could not notify her.

29. In or around 2016, Plaintiff went to Human Resources (HR) about this issue and HR representative Ileana Soriana told Plaintiff to bring in a doctor's note regarding her need to be notified prior to maintenance with chemicals.

30. Plaintiff submitted this medical documentation as an accommodation request but continued not to be notified of maintenance.

31. When Plaintiff again reported concerns about her accommodation not being honored, Ms. Soriana stated that her doctor's note had been lost.

32. The carelessness of Plaintiff's disability increased Plaintiff's fear of working at the office and having severe asthma attacks was increasingly creating a hostile work environment.

33. In or around early 2020, Plaintiff experienced another severe asthma attack at work and was forced to leave the office.

34. Plaintiff's attack was triggered by toxic fumes that entered the building during roof repairs.

35. Mr. Niemann later stated that he was unaware the building owner had scheduled roof repairs.

36. During repairs, the roofing contractor failed to close the ventilation vents during the repair, allowing hazardous fumes and chemical toxins to circulate directly through the building's ventilation system and into the office environment.

37. Plaintiff's supervisor, Lyndee Macaskill, told Plaintiff she could work from home.

38. Ms. Macaskill was supportive of Plaintiff working from home because she had witnessed Plaintiff's asthma attacks and said she was genuinely scared for her wellbeing.

39. Within a few days of that incident, while still working from home, all employees were told to work from home due to Covid-19 pandemic.

40. In or around 2020 or 2021, Plaintiff's supervisor changed from Lyndee to Tiffany.

41. Plaintiff worker from home without issue for four (4) years.

42. There were no tasks she would do at the office that Plaintiff could not complete at home.

43. Plaintiff would attend daily check-in meetings remotely where she would discuss what she was working on, any issues they arose, and other employees would join as well.

44. Otherwise, Plaintiff's role did not require any collaboration with employees in the office.

45. Plaintiff managed accounts in Asia and Europe and worked with people all over the world further indicating that Plaintiff did not need to work in person to complete all essential job functions.

46. Furthermore, while working remotely, Plaintiff's job performance had remained strong receiving multiple Employee of the Quarter nominations, merit-based raises, and recognition for assisting other departments accomplishing their projects in addition to her own.

47. The recognition, along with her merit increases, demonstrates that Plaintiff was meeting and, in many cases, exceeding expectations of her role.

48. In the last few years of her employment with Defendant, Plaintiff started hearing from HR that they needed Plaintiff to update her accommodation note specifically in or around July to August 2023.

49. Plaintiff complied with submitting updated medical documentation which HR stated would need to be completed every six (6) months.

50. However, HR then changed the requirement from six (6) months to three (3) months.

51. Defendant again changed the requirement in or around December 2023 to two (2) months subjecting Plaintiff to a hostile work environment on the basis of her disability by consistently changing the requirements for her disability to be accommodated.

52. As a result of Defendant's changing requirements, Plaintiff would have to go back to the doctor frequently even though her doctor indicated on documentation that her condition would not change; if anything, her condition would worsen.

53. Defendant's HR then began pressuring Plaintiff to return to in-office work, directly contradicting her doctor's documented medical recommendation that she work early to prevent serious asthma exacerbations.

54. During communications with HR, HR became increasingly hostile in their communications and even made negative comments about Plaintiff's disability.

55. On one occasion, on or around April 8, 2024, Erin told Plaintiff was told that she was not homebound and her outside life occurred outside of her home so there was no reason she couldn't come to the office.

56. In reality, Plaintiff had never claimed to be homebound; just based on her prior experiences with Defendant, the maintenance activities in that particular building would trigger her asthma, and the accommodation to have Defendant notify her of maintenance beforehand had not worked in practice.

57. Plaintiff was also being treated differently than other individuals as another co-worker was permitted to work from home, Jennifer London, but not required the excessive documentation that Plaintiff was required to provide.

58. By imposing stricter and inconsistent work-from-home requirements on Plaintiff than on other employees, Defendant created an unequal and discriminatory working environment.

59. The continued pressure from HR to ignore her doctor's note and return to the office subjected Plaintiff to a hostile work environment as Defendant was asking Plaintiff to disregard her own health.

60. Plaintiff's supervisor, Tiffany Johnson, and skip-level supervisor, Lisa Moore, stated they did not mind Plaintiff working from home as Plaintiff was accessible and her work was completed on time.

61. Plaintiff even engaged in protected activity when she reported to Lisa Moore that she was feeling uncomfortable with the way HR was communicating with Plaintiff as it seemed to be hostile.

62. Plaintiff even cc'd some of the higher up HR executives on these communications because she felt that Defendant's HR reps were talking to her aggressively and inappropriately.

63. Eventually, Defendant outsourced accommodation requests to a third-party administrator, Aflac, who again requested documentation.

64. Plaintiff provided the documentation as requested.

65. In response, Aflac recommended an air filter in the conference room.

66. Based on this, HR stated they would get an air filter and Plaintiff needed to come back to work.

67. However, Defendant did not provide any detailed information about the air filter so she could review it with her doctor or address the fact that Plaintiff could not always work from the conference room.

68. HR's reason for requiring Plaintiff to return to work was due to better collaboration, however this reason was pretextual as Plaintiff's accounts were in Asia and Europe.

69. Upon Plaintiff's information and belief, other employees who were permitted to work from home were not being pressured like Plaintiff to return to the office.

70. The stress of being repeatedly threatened with termination unless she returned to office, while still under doctor's care, was overwhelming.

71. Plaintiff was not medically released to return yet continually given ultimatums.

72. The pressure significantly impacted Plaintiff's ability to think clearly and function causing stress that exacerbated her medical condition.

73. Plaintiff requested for communication to be written so she could have confirmation of what was being communicated between her and HR, but HR continued to contact Plaintiff by phone and teams.

74. Plaintiff was initially informed that if she did not return to office by April 1, 2024, Plaintiff would be considered to have "resigned".

75. However, Defendant later changed this date.

76. Plaintiff on or about March 18, 2024, and on multiple other occasions reminded HR that she was under a doctor's care and had not been medically released to return to work in the office.

77. Erin Schultze advised Plaintiff that Defendant had obtained an air purifier and that it was reasonable accommodation.

78. However, Plaintiff was never provided any information about the air filter so she could review it with her doctor to determine if it would be effective for her medical condition.

79. Additionally, the proposed accommodation did not take into consideration the logistics of accessing the air purifier.

80. To reach the conference room where the purifier was reportedly located, Plaintiff would need to enter a multi-unit office building, go upstairs, and walk through common and office areas.

81. These are not controlled environments, and Plaintiff would be exposed before even reaching the air purifier.

82. Furthermore, Plaintiff would not remain continuously in that conference room, as she would need to leave for meetings, restroom breaks, lunch, and other routine activities.

83. There are also times when management requires use of conference rooms for other meetings, meaning access could be revoked at any time.

84. Despite Plaintiff's ongoing medical status and lack of medical release to return to the office, Plaintiff was repeatedly given ultimatums that failure to report in person would be treated as a voluntary resignation.

85. HR told Plaintiff that if she did not return to the office by April 8, 2024, she would be considered to have resigned.

86. However, Plaintiff was still not cleared to return to in-office work.

87. Therefore, Plaintiff did not resign from her employment as she was still willing and capable of continuing to work for Defendant.

88. Defendant failed to accommodate Plaintiff's disability or provide information for Plaintiff to determine whether the air filter would be a sufficient tool to help manage her disability while in office.

89. Ultimately, on or about April 8, 2024, Plaintiff was terminated on the basis of Plaintiff's disability and for engaging in a protected activity as described above.

90. The purported justification for termination was unlawful discrimination on the basis of disability or because Defendant perceived Plaintiff as disabled.

91. Plaintiff can show that she engaged in statutorily protected activity—a necessary component of her retaliation claim—because Plaintiff requested accommodation and submitted documentation on multiple occasions.

## COUNT I
### Violation of the Americans with Disabilities Act
### (Disability-Based Discrimination)

92. Plaintiff repeats and re-alleges paragraphs 1-91 as if fully stated herein.

93. By virtue of the conduct alleged herein, Defendant intentionally discriminated against Plaintiff based on Plaintiff's disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq*.

94. Plaintiff met or exceeded performance expectations.

95. Plaintiff was treated less favorably than similarly situated employees outside of Plaintiff's protected class.

96. Defendant terminated Plaintiff's employment on the basis of Plaintiff's disability.

97. Defendant's conduct toward Plaintiff illustrated a willful and/or reckless violation of the ADA.

98. Plaintiff is a member of a protected class under the ADA due to Plaintiff's disability.

99. Defendant acted in willful and/or reckless disregard of Plaintiff's protected rights.

100. As a direct and proximate result of the discrimination described above, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, and loss of enjoyment of life.

## COUNT II
### Violation of the Americans with Disabilities Act
### (Failure to Accommodate)

101. Plaintiff repeats and re-alleges paragraphs 1-91 as if fully stated herein.

102. By virtue of the conduct alleged herein, Defendant engaged in unlawful employment practices by failing to accommodate Plaintiff's disability in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101 *et seq*.

103. Plaintiff is a qualified individual with a disability.

104. Defendant was aware of the disability and the need for accommodation.

105. Defendant failed to engage in the interactive process to determine the appropriate accommodation after Plaintiff requested reasonable accommodation.

106. Plaintiff's reasonable accommodation that was requested was not an undue burden on Defendant.

107. Defendant did not accommodate Plaintiff's disability.

108. Plaintiff is a member of a protected class under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101 *et seq*., due to Plaintiff's disability.

109. Defendant acted in willful and/or reckless disregard of Plaintiff's protected rights.

110. As a direct and proximate result of the failure to accommodate described above, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, and loss of enjoyment of life.

## COUNT III
**Violation of the Americans with Disabilities Act**
**(Disability-Based Harassment)**

111. Plaintiff repeats and re-alleges paragraphs 1-91 as if fully stated herein.

112. By virtue of the conduct alleged herein, Defendant engaged in unlawful employment practices and harassed Plaintiff on the basis of Plaintiff's disability in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101 *et seq*.

113. Defendant knew or should have known of the harassment.

114. The disability-based harassment was severe or pervasive.

115. The disability-based harassment was offensive subjectively and objectively.

116. Plaintiff is a member of a protected class under Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101 *et seq*., due to Plaintiff's disability.

117. Defendant acted in willful and/or reckless disregard of Plaintiff's protected rights.

118. As a direct and proximate result of the harassment described above, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, and loss of enjoyment of life.

## COUNT IV
**Violation of the Americans with Disabilities Act**
**(Retaliation)**

119. Plaintiff repeats and re-alleges paragraphs 1-91 as if fully stated herein.

120. Plaintiff is a member of a protected class under 42 U.S.C. §12101, *et seq.*

121. During Plaintiff's employment with Defendant, Plaintiff requested accommodation on multiple occasions and reported conduct that amounted to disability discrimination and/or harassment.

122. As such, Plaintiff engaged in protected conduct and was protected against unlawful retaliation by Defendant under the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq*.

123. In response to Plaintiff's complaint, Defendant failed to conduct a prompt, thorough, and objective investigation of Plaintiff's complaint of disability-based harassment or discrimination.

124. Defendant also failed to take necessary precautions to prevent further recurrences of the discriminatory or harassing conduct complained of by Plaintiff.

125. By virtue of the foregoing, Defendant retaliated against Plaintiff based on Plaintiff requesting accommodation and reporting conduct that constituted harassment and/or discrimination, thereby violating the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq*.

126. Plaintiff suffered an adverse employment action in retaliation for engaging in protected activity.

127. Defendant acted in willful and/or reckless disregard of Plaintiff's protected rights.

128. As a direct and proximate result of the retaliation described above, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, and loss of enjoyment of life.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court find in Plaintiff's favor and against Defendant as follows:

    a.    Back pay with interest;

    b.    Payment of interest on all back pay recoverable;

    c.    Front pay;

    d.    Loss of benefits;

    e.    Compensatory and punitive damages;

    f.    Reasonable attorneys' fees and costs;

    g.    Award pre-judgment interest if applicable; and

    h.    Award Plaintiff any and all other such relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests that all issues be submitted to and determined by a jury. Dated this 7th day of March 2026.

    /s/ *Sophia K. Steere*
    **SOPHIA K. STEERE, ESQ.**
    **NATHAN C. VOLHEIM, ESQ.**
    **SULAIMAN LAW GROUP LTD.**
    2500 S. Highland Avenue, Suite 200
    Lombard, Illinois 60148
    Phone (331) 307 - 7634
    Fax (630) 575 - 8188
    ssteere@atlaslawcenter.com
    nvolheim@sulaimanlaw.com
    *Attorneys for Plaintiff*